**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NOW HEALTH GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 22-cv-05115 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| L.J. COOPER COMPANY, and | ) | |
| LEONARD J. COOPER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

L.J. Cooper Company ("LJC") sold psyllium husk powder, a soluble fiber, to NOW Health

Group ("NOW"). NOW used LJC's psyllium husk powder to create a capsulized dietary

supplement. In April 2022, NOW tested its finished capsules and found Salmonella. It says it then

tested the raw product supplied by LJC, and found Salmonella there too. NOW brought suit against

LJC to recover the costs it incurred as a result of the Salmonella contamination. LJC countersued,

arguing that NOW had unjustifiably failed to pay for some of the goods LJC delivered. The parties

cross-filed motions for summary judgment. NOW's motion for summary judgment is denied,

LJC's motion for summary judgment on its counterclaims is denied, and LJC's motion for

summary judgment on NOW's claims is granted in part and denied in part. The fundamental issue

in this case is whether the Salmonella came from LJC's psyllium husk powder or another source,

and on the evidence presented, a reasonable jury could come to either conclusion.

**BACKGROUND**

LJC and NOW enjoyed a commercial relationship for over twenty-five years, wherein LJC

sourced psyllium husk powder from manufacturers in India and sold it to NOW. Joint Statement

of Facts ("Joint SOF") 2 ¶¶ 4–5, ECF No. 103. LJC's manufacturer contracted with another

company to sterilize the powder, meaning that LJC neither manufactured nor sterilized the powder itself. *Id.* at 4 ¶ 12–13. In fact, LJC claims it does not even open any of the bags that it ships to its customers; it contracted with Dalare Associates Inc. to have the psyllium husk powder tested before shipment to NOW. Defs.' Statement of Facts ("Defs.' SOF") 9 ¶ 223, ECF No. 102.

On May 12, 2021, NOW sent a purchase order to LJC, number 399474, for 190,000 kilograms of psyllium husk powder. Joint SOF 4–5 ¶¶ 14–18. The purchase order stated that "[p]roducts not meeting specifications will require full monetary refund for material and freight." *Id.* at 6 ¶ 21. The specification sheet provided LJC notice that the psyllium husk powder would be used for human consumption. *Id.* at 6 ¶ 22. The purchase order also had attached terms and conditions, which included requirements that the seller provide a certificate of analysis and meet the FDA's good manufacturing practices. *Id.* at 7 ¶¶ 26–27. The terms further stated that the seller certified the goods were "fit for human consumption," that the seller would indemnify the purchaser for liabilities relating to the goods, and that the purchaser could reject any product not in compliance with its specifications. *Id.* at 8–9 ¶¶ 31–33. LJC acknowledged that it read the terms and conditions, which had been the same for decades. *Id.* at 7 ¶ 28. LJC did not sign the purchase order, but it did not communicate any disagreement with the terms and conditions to NOW. *Id.* at 8 ¶ 30; Defs.' SOF 4 ¶ 210.

The psyllium husk powder purchased by and delivered to NOW pursuant to Purchase Order 399474 comprised several LJC-defined lots with specific LJC lot numbers. Joint SOF 12 ¶ 43. LJC says it had its psyllium husk powder tested by Dalare on March 10, 2022, and the test came back negative for Salmonella. Defs.' SOF 9 ¶ 223. LJC then provided NOW with the various lots of psyllium husk powder, including LJC Lot 17173 / NOW Lot 3247693 (hereinafter "Lot 73"),

2

pursuant to Purchase Order No. 399474 on or about March 22. Joint SOF 11 ¶ 41. NOW paid LJC over $700,000 for Purchase Order No. 399474. *Id.* at 11 ¶ 42.

Upon receipt of the powder, NOW conducted its own initial testing of Lot 73 on March 24, 2022, which was negative for Salmonella. Defs' SOF 11 ¶ 228. NOW's testing did, however, find high Enterobacteria levels in Lot 73.[1] Joint SOF 13 ¶ 45. NOW then conducted further testing of Lot 73 and, on April 5, 2022, determined that it did not pose any food safety risk; the form NOW used to document the additional testing indicated that the final disposition of the product tested was "approve[d]." *Id.* at 13–14 ¶ 46. NOW used the powder to create a product called Vcap, which contains a proprietary blend of ingredients. *Id.* at 13 ¶ 44. On April 13, 2022, NOW tested a composite sample of the Vcaps, including those using powder from Lot 73, and received a presumptive positive for Salmonella. *Id.* at 15 ¶ 51. NOW reported the test to the FDA on April 20. *Id.* at 16 ¶ 55. Nearly a month later, on May 16, NOW concluded that Lot 73 was the source of the Salmonella, and notified LJC. *Id.* at 12 ¶ 43; *id.* at 16 ¶¶ 54–55.

LJC asked to retrieve the powder that NOW no longer wanted, but NOW believed it needed to destroy the powder because it was contaminated. *Id.* at 18 ¶¶ 61–62. The parties proceeded to correspond with both the FDA and the Illinois Department of Public Health until the FDA approved LJC's reconditioning proposal for the powder in April of 2024. *Id.* at 19–25 ¶¶ 65–92. That plan involved LJC selling Lot 73 for erosion control and landscaping uses, and accepting a return of Lots 16724, 17171, 17172, 17174, and 17319, as to which there had never been any

---

[1] Salmonella is in the Enterobacteriaceae family. *Salmonella enterica spp. Biological Agent Reference Sheet (BARS)*, Cornell University: Environment, Health and Safety (Nov. 30, 2023), https://ehs.cornell.edu/research-safety/biosafety-biosecurity/biological-safety-manuals-and-other-documents/bars-other/salmonella-enterica-spp.

indication of contamination. *Id.* at 23–24 ¶ 88. The parties came to an indemnification agreement regarding the returned lots. *Id.* at 26–27 ¶¶ 93–98.

NOW brought suit against LJC, seeking damages for the costs resulting from the allegedly contaminated psyllium husk powder. LJC countersued NOW, saying that NOW wrongfully failed to pay for one of the lots LJC delivered. Both parties moved for summary judgment.

## **DISCUSSION**

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which directs courts to grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the nonmovant bears the burden of proof at trial, it must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). A genuine issue exists when "a reasonable jury could return a verdict for the non-moving party." *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 609 (7th Cir. 2023) (quoting *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022)). Thus, on reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the nonmovant. *Weaver*, 28 F.4th at 820.

### I. Rule 56.1 Statements

The Northern District of Illinois' Local Rules ("LR") require a summary judgment movant to file a statement of material facts, directing the court to the relevant facts found throughout the discovery process. LR 56.1(a)(2). In response, the nonmovant must admit or dispute each of the facts the movant has put forth. LR 56.1(e)(2). If the nonmovant wants to designate facts showing a genuine issue that the movant has not yet designated, it can file a statement of additional material facts. LR 56.1(b)(3). These statements of facts help the Court efficiently evaluate the parties' respective arguments, especially given "the high volume of summary judgment motions and the

4

benefits of clear presentation of relevant evidence and law." *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011).

NOW asks the Court to strike LJC's statement of facts for a litany of reasons. It claims LJC included too many facts in each numbered paragraph, added facts in footnotes, filed more than the 80 facts permitted by Local Rule 56.1, filed immaterial facts, failed to cite to transcript lines, improperly cited to demonstrative evidence, asks the Court to make credibility determinations, makes legal arguments, asks for summary judgment on its counterclaims without a good faith basis, includes language from the indemnification agreement in violation of evidentiary rules, contradicts the parties' joint statement of facts, argues about the absence of discovery that the Court already ruled on, and makes false statements about the evidence. Pl.'s Resp. to Defs.' SOF 2–3. But "[m]otions to strike all or portions of an opposing party's LR 56.1 submission are disfavored." LR 56.1 (e)(2). Litigants should instead include arguments about why the information should not be considered in their response or reply brief. *Id.*

In attempting to get this Court to discount LJC's statement of facts, NOW cuts off its nose to spite its face. Instead of actually disputing many of LJC's facts by "cit[ing] specific evidentiary material that controverts the fact," as required by the Local Rules, in many instances NOW relies only on its objections. To take one example, NOW says in response to one of LJC's facts: "Disputed and Immaterial. NOW objects not supported by a citation. NOW objects not supported by admissible evidence under FRCP 56(c)(2). NOW objects to multiple facts in a single paragraph in violation of LR 56.1(a)." Pl.'s Resp. to Defs.' SOF 50 ¶ 222. None of this explains **why** NOW disputes the fact, nor does it cite to anything contradicting it. As for the allegedly "false statements as to evidence," *id.* at 3, NOW overplays its hand, as another example illustrates: "Disputed. Ms. Atoyebi's deposition does not have testimony which states 'The Purchase Order was not signed'

5

on page 86. Ms. Atoyebi's deposition correctly reads: 'Q. Are you aware of any version of this purchase order that is signed? A. No, I'm not.'" That cannot be fairly characterized as a false statement about the evidence. Perhaps it overstates the significance of the testimony, but NOW fails to even properly deny the statement, since it does not point to anything that contradicts the assertion.

As always, the Court does not make credibility determinations or accept legal conclusions as true on summary judgment. Where NOW properly objects to the admissibility or accuracy of a purported material fact, the Court takes that into consideration. The Court declines, however, to strike LJC's statement of facts.

## II. NOW's Claims

NOW alleges that LJC is liable for breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty for a particular purpose, breach of contract, negligence, and express indemnification. Each of these theories hinges on the allegation that LJC's psyllium husk powder was the source of the Salmonella in NOW's Vcaps. That proposition, though, is far from certain. For that reason, NOW cannot meet its burden for summary judgment. In its own motion for summary judgment, LJC advances a number of defenses that it claims would insulate it from liability, regardless of where the Salmonella came from. Only some of those defenses succeed, as explained below.

### a. Source of Contamination

NOW argues that it is entitled to summary judgment because, in its eyes, the source of the Salmonella is clear. NOW tested its finished product containing Lot 73, and the product was

6

positive for Salmonella.[2] Pl.'s Statement of Facts ("Pl.'s SOF") 4 ¶ 7, ECF No. 101. Then, NOW says, it tested a sealed bag from Lot 73, which also came back positive for Salmonella.[3] *Id.* at 4 ¶ 9. That is enough for a reasonable jury to find that Lot 73 was the source of the contamination. But LJC pokes holes in NOW's theory. For one, Lot 73 was tested by Dalare before LJC sent it to NOW, and NOW tested it upon receipt. Both tests were negative for Salmonella. Defs.' SOF 9 ¶ 223; *id.* at 12 ¶ 232. LJC points to other presumptively positive tests for Salmonella in NOW's facility that were unrelated to LJC's product. *Id.* at 3–4 ¶¶ 208–09. LJC further provides an expert opinion that, based on the serotypes of Salmonella found in the Vcaps and Lot 73, it is highly unlikely that they share a common source. *Id.* at 22 ¶ 253. What is more, Lot 73 was not used in one of the Vcap blends that tested positive. *Id.* at 17 ¶ 244.

The above makes evident that the case NOW primarily relies on—*Blommer Chocolate Co. v. Bongards Creameries, Inc.*—is inapplicable. NOW points to *Blommer* as a factually analogous case in which the court found there was no triable issue on the source of Salmonella contamination in the plaintiff's product. 635 F. Supp. 919, 925–26 (N.D. Ill. 1986). But in *Blommer*, the raw material provided by the defendant, the bags, and the defendant's machinery "were all contaminated by an identical strain of salmonella out of fifteen hundred possible strains." *Id.* at 925. Moreover, the defendant in *Blommer* did not provide any other explanation for the existence of the Salmonella. *Id.* at 925–26. *Blommer* therefore differs in salient ways from the case at hand;

---

[2] LJC argues that there is no admissible evidence to support this contention on authentication and hearsay grounds. But see the below subsection on damages for an explanation of why the Court considers unauthenticated test results at this stage. Moreover, NOW cites to an in-house test, which can likely meet the regularly conducted business activity exception to hearsay. Many of LJC's arguments go to the weight, not the admissibility, of this evidence.

[3] LJC contends there is no admissible evidence the bag was sealed; however, one of NOW's employees' affidavits says that it was sealed. Pl.'s Ex. 7, at 2 ¶ 6, ECF No. 101-8.

a reasonable jury could find that the Salmonella was introduced to the Vcaps from a different source based on LJC's evidence.

Because there is a genuine issue of material fact over whether LJC's psyllium husk powder was the source of the Salmonella, NOW's motion for summary judgment on its own claims is denied.

### b. LJC's Defenses

LJC argues that NOW cannot sustain its claims regardless of the Salmonella's origin. While these arguments largely fail, LJC is entitled to summary judgment on NOW's negligence claim. Moreover, the Court finds that NOW cannot recover attorneys' fees.

### i. Acceptance

LJC first argues that NOW accepted the psyllium husk powder within the meaning of the Uniform Commercial Code ("UCC"), vitiating its claims. Under the UCC, as adopted by Illinois, "goods are deemed accepted if the buyer . . . fails, after having had a reasonable amount of time in which to inspect them, to communicate its rejection to the seller." *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 655 (7th Cir. 1998); 810 Ill. Comp. Stat. § 5/2-606(1)(b) (West 2026). LJC says that NOW did not communicate any rejection of the powder within thirty days of receiving it, so it accepted the goods and never effectively revoked that acceptance. Defs.' Mot. Summ. J. Mem. 1–5, ECF No. 98. But LJC cites no conclusive authority for the proposition that a rejection of goods must be made within 30 days to preclude acceptance; the question of what period of time was reasonable under the circumstances to reject the goods should be left to the jury. *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 940 (N.D. Ill. 2013) ("Whether an action 'is to be judged as reasonable' under the Illinois UCC is

8

a determination that 'rests with the trier of fact.'" (quoting *Veath v. Specialty Grains, Inc.*, 546 N.E.2d 1005, 1010 (Ill. App. Ct. 1989))).

More importantly, acceptance would not necessarily undercut NOW's claims. The UCC permits a party to seek a remedy even where there was acceptance, so long as the buyer notifies the seller of breach "within a reasonable time after he discovers or should have discovered any breach." 810 Ill. Comp. Stat. § 5/2-607(3)(a) (West 2026); *id.* § 5/2-607 (titled "Burden of Establishing Breach After Acceptance"); *see also* 1 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial Code § 9:7 (6th ed. 2020) ("The Code differentiates between two goods-oriented remedies of the buyer: a right of 'rejection' and a right to 'revoke acceptance.' The second presupposes acceptance."). In fact, Judge Coleman has persuasively explained that acceptance is actually ***required*** for a breach of warranty claim. *Dual-Temp of Ill., Inc. v. Hench Control Corp.*, No. 09-CV-00595, 2013 WL 453134, at *5 (N.D. Ill. Feb. 6, 2013). Illinois law calculates breach of warranty damages as the difference between the value of goods accepted and their value as warranted, implying the need for acceptance. *Id.*; 810 Ill. Comp. Stat. § 5/2-714(2) (West 2026). But again, the question of whether acceptance occurred is one of fact for the jury.

### ii. Terms and Conditions

LJC next contends that it never agreed to the terms and conditions upon which some of NOW's claims are premised. Defs.' Mot. Summ. J. Mem. 10–11. LJC says that it never signed the purchase order, and the UCC generally requires that contracts for goods over $500 be memorialized in a signed writing. 810 Ill. Comp. Stat. § 5/2-201(1) (West 2026).

The UCC contains exceptions to the writing requirement, however. The first one relevant here is the admission exception, which states that a contract is enforceable "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract

9

for sale was made." *Id.* § 5/2-201(3)(b). NOW persuasively argues that because LJC admitted the existence and operation of the purchase order, it meets this exception. Pl.'s Mot. Summ. J. Resp. 7, ECF No. 113; Joint SOF 4–5 ¶ 14 ("Defendants admit the 'existence and operation of . . . the Purchase Order.'"). Second, the merchant exception applies to agreements between merchants when "within a reasonable time a record in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents," and the party receiving it does not object within ten days. *Id.* at § 5/2-201(2). The purchase order seemingly satisfies these requirements. Finally, the part performance exception applies to goods "for which payment has been made and accepted or which have been received and accepted." If a jury finds that NOW accepted the goods, this exception would apply as well. Thus, the lack of LJC's signature does not preclude NOW from enforcing the Purchase Order's terms and conditions.

LJC points out that the terms and conditions say that "Purchaser's quality tests and interpretation of such results will be the final determination of that product's compliance." Defs.' Mot. Summ. J. Mem. 11. Because NOW originally determined that the psyllium husk powder delivered by LJC was safe, LJC argues the determination binds NOW. But the terms do not say that the Purchaser is limited to its original testing or that it cannot retest the goods later. On the flip side, NOW argues that its final test showing Salmonella precludes LJC from arguing that its product was not the source of contamination.[4] Pl.'s Mot. Summ. J. Mem. 9, ECF No. 100. This interpretation reads the relevant term too broadly, though. To start, NOW's test of its final Vcaps product cannot be considered a test of LJC's product, because the creation of the Vcaps in NOW's facility introduced other opportunities for contamination. The test of one of the Lot 73 bags would

---

[4] NOW calls this an "estoppel" argument, but it is really one about contract interpretation. *Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 779 (Ill. 2016) ("Application of promissory estoppel is proper only in the absence of an express agreement.").

be covered by this term, but it does not impede LJC's ability to argue that the bag was not the source of the Salmonella in the Vcaps (especially in light of the fact that NOW claims the bag was unopened when tested).

As for LJC's argument that it complied with the terms and conditions because it accepted a return of the powder, that is irrelevant to the question of whether LJC provided psyllium husk powder tainted with Salmonella, which the terms and conditions prohibit.[5]

### iii. *Moorman*

LJC maintains that NOW's negligence claim is barred by the Illinois Supreme Court's decision in *Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1982). In *Moorman*, the court held that plaintiffs may recover for purely economic loss caused by defective goods in contract, but not in tort. *Id.* at 450. There is an exception to the *Moorman* economic loss doctrine, though, for some sudden and dangerous occurrences that are "best served by the policy of tort law." *Id.* Economic losses are "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Id.* at 449 (quoting Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 918 (1966)).

In response, NOW again points to *Blommer*, in which the plaintiff was permitted to proceed with its tort claims because "the contamination of Blommer chocolate and of its processing facilities might be analogized to a sudden and calamitous occurrence caused by a defective

---

[5] For a similar reason, LJC's argument about how NOW used the psyllium husk for a capsulized final product—contrary to the specifications stating it would be used for a powder product—is irrelevant. What matters is that NOW used it as specified for human consumption, so whether the Salmonella came from LJC's products is still the salient question. Moreover, any breach based on what NOW used the powder for would clearly be immaterial, and did not cause LJC damages.

product." 635 F. Supp. at 916–17. *Blommer*, however, was decided before the Illinois Supreme Court made clear that a sudden and calamitous event alone does not meet the exception to *Moorman*'s economic loss rule. "Rather, the exception is composed of a sudden, dangerous, or calamitous event **coupled with** personal injury or property damage." *In re Chicago Flood Litig.*, 680 N.E.2d 265, 275 (Ill. 1997) (emphasis added). NOW does not allege any personal injury or property damage. Instead, it seeks recovery for economic losses from the allegedly defective psyllium husk powder. *See Nationwide Agribusiness Ins. Co. v. USG Corp.*, 713 F. Supp. 3d 503, 512–14 (N.D. Ill. 2024) (finding that *Moorman* precluded plaintiff's negligence claim where the losses claimed were "reasonably foreseeable as a direct consequence of the failure of the defective product in a deal for raw ingredients" (citation modified)). For that reason, *Moorman*'s economic loss doctrine precludes NOW's negligence claim.

### iv.  Duplicative Claims

NOW seeks to recover for both express indemnification and breach of contract, which LJC argues are duplicative of each other and NOW's UCC claims. Defs.' Mot. Summ. J. Resp. 11, ECF No. 116. But NOW may attempt to prove its various claims, though it cannot recover twice for the same harm. *See BCS Servs., Inc. v. BG Invs., Inc.*, 728 F.3d 633, 641 (7th Cir. 2003) (discussing how the one-satisfaction rule "prevent[s] compensation in excess of the plaintiff's loss").

LJC also vaguely argues that the UCC displaces NOW's common-law claim for breach of contract, mentioning that "[t]he UCC supplants common-law principles to the extent there is any conflict." Defs.' Mot. Summ. J. Resp. 11. That's not quite right. The UCC displaces common-law remedies where a provision of the UCC "fits the facts of the case to a T." *Travelers Cas. & Sur. Co. of Am. v. Nw. Mut. Life Ins. Co.*, 480 F.3d 499, 505 (7th Cir. 2007); *see also Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09 C 2513, 2011 WL 1131292, at *14 (N.D. Ill. Mar. 28,

2011). This appears to be an academic inquiry, though—the question of whether the UCC displaces common law claims usually arises where one claim is barred by the statute of limitations. Because there is no statute of limitations at issue here, and LJC does not explain why it thinks the breach of contract claim is supplanted (nor how a common-law claim would even differ from one under the UCC), LJC is not entitled to summary judgment on this ground.

### v. Damages

NOW claims damages for the cost of the allegedly defective product, testing costs, destruction expenses, pre- and post-judgment interest, litigation costs, and attorneys' fees. Third Am. Compl. 17, ECF No. 26. LJC seeks to limit those damages on various grounds: that NOW did not sufficiently provide a computation of its damages, that NOW unreasonably delayed in notifying LJC of the alleged breach, that any damages should be limited to Lot 73, that NOW did not adequately prove causation, that there is no admissible evidence of destruction expenses or testing expenses, and that NOW cannot seek attorneys' fees or pre- and post-judgment interest. Defs.' Mot. Summ. J. Mem. 12–15.

To begin, several of LJC's arguments can be easily rejected. First, whether NOW unreasonably delayed in notifying LJC of the alleged breach is, as discussed above, a question of fact for the jury. Additionally, the question of causation (*i.e.*, where the Salmonella came from) is also a factual question that a jury must decide. NOW is not entitled to summary judgment on those grounds.

LJC next maintains that NOW did not provide a sufficient computation of its claimed categories of damages during discovery. Fed. R. Civ. P. 26(a)(1)(A)(iii) ("[A] party must, without awaiting a discovery request, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party . . . ."). For that reason, LJC argues, NOW cannot

introduce evidence of its damages at trial. Defs.' Mot. Summ. J. 12; Fed. R. Civ. P. 37(c)(1). In deciding whether to exclude evidence under Rule 37, courts should consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019) (quoting *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012)). NOW disclosed its claimed damages for the allegedly defective product, testing expenses, and destruction expenses, as well as the evidentiary support for those claimed damages. Pl.'s SOF 8 ¶¶ 18–21. While LJC might dispute the accuracy of those damages, there is no reason to exclude NOW's evidence of them.

Next, LJC argues that NOW should be limited to seeking damages related to Lot 73. And because LJC refunded NOW $99,476.25 of the $116,850 it paid for Lot 73, LJC says that NOW's damages are limited to $17,373.75. Defs.' Mot. Summ. J. 13. NOW responds that it chose to reject the entire delivery, rather than just Lot 73, which it was permitted to do under the UCC.[6] Pl.'s Mot. Summ. J. Resp. 11–12; 810 Ill. Comp. Stat. § 5/2-601 (West 2026). NOW therefore argues that LJC's refund was insufficient and that LJC was also on the hook for the destruction and testing expenses NOW incurred with respect to the lots other than Lot 73. *Id.* at 12. But NOW cannot, of course, seek damages for the portion of the purchase price LJC refunded. Nor may it seek destruction costs for the returned goods. NOW may, however, attempt to prove that LJC's breach as to Lot 73 required NOW to incur testing and destruction costs for other lots before they were rejected and returned.

---

[6] LJC argues that the Purchase Order comprised several deliveries, and that Lot 73 made up a delivery on its own. Pl.'s Mot. Summ. J. Reply 3–4. It is unclear to the Court exactly what was delivered and when, making this a prime example of a disputed material fact.

LJC also contends that NOW has no admissible evidence of destruction or testing expenses because it has no witness to authenticate the documents it provides in support of those damages. Defs.' Resp. to Pl.'s SOF 27–28 ¶¶ 19–20, ECF No. 117. Federal Rule of Evidence 901 requires that evidence be authenticated by other evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). But "[a]t the summary judgment phase, the Court may consider unauthenticated documents 'if it appears that they are capable of authentication at trial.'" *Montoya v. Mitchell*, No. 17 C 01796, 2024 WL 1328799, at *3 (N.D. Ill. Mar. 28, 2024) (quoting *Remmer v. Wexford Health Sources, Inc.*, No. 19 C 00420, 2021 WL 535542, at *4 (S.D. Ill. Feb. 12, 2021)). LJC does not appear to actually dispute that the documents are genuine, *see Quinn v. Wexford Health Sources, Inc.*, No. 17 C 00669, 2020 WL 888048, at *2 (S.D. Ill. Feb. 24, 2020) (noting that "mere *pro forma*" objections are frowned upon), so there is no reason to doubt that NOW could authenticate the documents at trial. As such, the Court considers the evidence of destruction and testing expenses.

NOW also seeks recovery of the attorneys' fees it has incurred in this action. The terms and conditions attached to the Purchase Order state as follows:

> Seller agrees to indemnify, defend and hold Purchaser . . . harmless from any claims, liabilities, losses, damages . . . and expenses relating to or arising from (i) the products, materials, supplies or equipment provided by Seller; (ii) Seller's breach of any warranty contained herein; or (iii) Seller's negligence or willful misconduct.

Joint SOF 9 ¶ 32. NOW maintains that this clause entitles it to attorneys' fees, given that it incurred those fees because of the allegedly defective product provided by LJC. Pl.'s Mot. Summ. J. Resp. 12, ECF No. 113. But "[i]t is well-settled that Illinois indemnity contracts must be strictly construed." *Northbound Grp., Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956, 972 (N.D. Ill. 2013). The terms and conditions do not explicitly say that NOW is entitled to attorneys' fees, so it cannot now

15

seek those fees. *Downs v. Rosenthal Collins Grp., LLC*, 895 N.E.2d 1057, 1061 (Ill. App. Ct. 2008) ("[T]he well-settled bright line rule on this issue provides certainty in the law and parties are on notice to include precise language on attorney fees when negotiating a contract.").

Finally, LJC maintains that because it refunded NOW's payment for the product NOW returned, NOW cannot seek pre- or post-judgment interest. Defs.' Mot. Summ. J. Mem. 15. But this argument is merely a rehashing of the argument that this Court has already discarded over limiting damages to the unreturned portion of Lot 73, so it requires no further discussion.

## III. LJC's Counterclaims

The parties also filed cross-motions for summary judgment on LJC's counterclaims for breach of contract, goods sold and delivered, unjust enrichment, conversion, and account stated. The counterclaims involve Lot 17174 ("Lot 74"), another lot of psyllium husk powder that LJC delivered to NOW to fulfill Purchase Order 399474. LJC alleges that NOW accepted Lot 74 and failed to pay for it. Counterclaims 5 ¶¶ 26–28, ECF No. 33.

### a. Mootness

NOW argues that it is entitled to summary judgment on LJC's counterclaims because it returned Lot 74, therefore mooting the claims. Pl.'s Mot. Summ. J. Mem. 14–15. Article III requires there be a live controversy between the parties at all times during the litigation. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020) ("Article III limits federal court jurisdiction to live cases and controversies and an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." (citation modified)). But LJC's motion makes clear that it now only seeks prejudgment interest on the value of Lot 74 for the time that it remained in NOW's possession. Defs.' Mot. Summ. J. Counterclaims 2, ECF No. 97. That is sufficient to keep LJC's claims alive. *See Gates v. Towery*, 430 F.3d 429, 432 (7th Cir. 2005)

16

("Mootness occurs when no more relief is possible. That point has not been reached."). NOW's motion for summary judgment on the counterclaims is denied.

### b. Merits

LJC argues that it is entitled to summary judgment on its counterclaims because there is no evidence that Lot 74 was contaminated. But the viability of LJC's counterclaims will hinge in part on whether NOW accepted the lot, or as NOW claims, rejected it. As the Court has already explained, those questions remain open. LJC is not entitled to summary judgment.

\* \* \*

The evidence in the record is not conclusive as to the source of the Salmonella in NOW's Vcaps, and a reasonable jury could find for either the plaintiff or the defendants. The motions for summary judgment are denied, except that NOW may not pursue its negligence claim or seek attorneys' fees.

Date: July 28, 2026

John J. Tharp, Jr.
United States District Judge

17